Appeal No. 15-1960

# United States Court of Appeals

*for the*

# Federal Circuit

JOBDIVA, INC.,

*Appellant,*

– v. –

JOBVITE, INC.,

*Appellee.*

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE,
TRADEMARK TRIAL AND APPEAL BOARD, CANCELLATION NO. 92050828

## BRIEF FOR APPELLANT

DANIEL I. SCHLOSS
MASAHIRO NODA
GREENBERG TRAURIG LLP
200 Park Avenue
New York, New York 10166
(212) 801-9200

*Attorneys for Appellant*

November 2, 2015

**FORM 9.  Certificate of Interest**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

JobDiva, Inc.      **v.**      Jobvite, Inc.

Case No.    15-1960

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Appellant JobDiva, Inc.     certifies the following (use "None" if applicable; use extra sheets if necessary):

1.       The full name of every party or amicus represented by me is:

JobDiva, Inc.

2.       The name of the real party in interest (Please only include any real party in interest NOT identified in Question 3. below) represented by me is:

JobDiva, Inc.

3.       All parent corporations and any publicly held companies that own 10 percent of the stock of the party or amicus curiae represented by me are listed below. (Please list each party or amicus curiae represented with the parent or publicly held company that owns 10 percent or more so they are distinguished separately.)

None

4.   ☐   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

Greenberg Traurig, LLP, Daniel J. Navarro, James H. Donoian, Heidi Garfield

September 11, 2015
Date

/Daniel I. Schloss/
Signature of counsel

Please Note: All questions must be answered

Daniel I. Schloss
Printed name of counsel

cc:    Counsel for Appellee

Reset Fields

# **TABLE OF CONTENTS**

Table of Authorities ................................................................................. ii

STATEMENT OF RELATED CASES ................................................... 1

JURISDICTIONAL STATEMENT ......................................................... 1

ISSUE PRESENTED ............................................................................... 1

STATEMENT OF THE CASE................................................................. 2

      I.     Proceedings Below ................................................................ 2
      II.    Preliminary Statement .......................................................... 2
      III.   Statement of Facts ................................................................ 4

SUMMARY OF ARGUMENT ................................................................ 7

ARGUMENT ........................................................................................... 7

      I.     Standard of Review .............................................................. 7
      II.    The Board's Finding of Abandonment is Not Supported by Substantial Evidence ......................................................... 8

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ............... 12

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ..................... 13

# TABLE OF AUTHORITIES

**Cases**

*In re Ancor Holdings*,
  79 U.S.P.Q.2d 1218, 2006 WL 1258813 (TTAB 2006)...............................10, 11

*Aycock Eng'g, Inc. v. Airflite, Inc.*,
  560 F.3d 1350 (Fed. Cir. 2009) ...................................................................8

*Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc.*,
  892 F.2d 1021 (Fed. Cir. 1989) ..................................................................9

*Consol. Edison v. NLRB*,
  305 U.S. 197 (1938)....................................................................................8

*Crash Dummy Movie, LLC v. Mattel, Inc.*,
  601 F.3d 1387 (2010)..................................................................................9

*Dickinson v. Zurko*,
  527 U.S. 150 (1999).....................................................................................8

*In re DSM Pharmaceuticals, Inc.*,
  87 U.S.P.Q.2d 1623, 2008 WL 2385957 (TTAB 2008)................................9, 10

*In re Gartside*,
  203 F.3d 1305 (Fed. Cir. 2000) ...................................................................8

*Liqwacon Corp. v. Browning-Ferris Industries, Inc.*,
  203 U.S.P.Q. 305, 1979 WL 24857 (TTAB 1979)............................................10

*Martahus v. Video Duplication Serv., Inc.*,
  3 F.3d 417 (Fed. Cir. 1993) .........................................................................9

*On-Line Careline, Inc. v. Am. Online, Inc.*,
  229 F.3d 1080 (Fed. Cir. 2000) ..................................................................8, 9

*In re Pacer Tech.*,
  338 F.3d 1348 (Fed. Cir. 2003) ...................................................................8

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951)....................................................................................8

**Statutes**

15 U.S.C. § 1071(a) .....................................................................................1

15 U.S.C. § 1127 ................................................................................................9

28 U.S.C. § 1295(a)(4)(B) ..................................................................................1

## STATEMENT OF RELATED CASES

There have been no other appeals in this matter before this Court or any other appellate court.  There are no other pending cases that would directly affect, or be directly affected by, this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

This appeal is from only that part of the April 16, 2015 Final Decision of the Trademark Trial and Appeal Board (the "Board") finding abandonment of the JOBDIVA Marks through nonuse for "personnel placement and recruitment services."  This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(B) and 15 U.S.C. § 1071(a).

## ISSUE PRESENTED

Does substantial evidence support the Board's finding that JobDiva abandoned the use of its JOBDIVA Marks for personnel placement and recruitment services?

## STATEMENT OF THE CASE

### I.     Proceedings Below

This is an appeal from only that part of the Board's final decision of April 16, 2015 ("April 16, 2015 Bd. Dec.") that granted Appellee's counterclaim for cancellation on grounds of abandonment of the marks JOBDIVA and JOBDIVA (collectively, the "JOBDIVA Marks") for personnel placement and recruitment services.

### II.     Preliminary Statement

It is undisputed that, since the founding of its business in 2003, JOBDIVA has actively used the JOBDIVA Marks for "computer services, namely, providing databases featuring recruitment and employment, employment advertising, career information and resources, resume creation, resume transmittals and communication of responses thereto via a global computer network."[1]    The Board's finding of abandonment of the JOBDIVA Marks for the closely interrelated services of "personnel placement and recruitment"[2] is clearly not supported by substantial evidence.

---

[1]  These services are included in Registration No. 3013235 for the mark JOBDIVA.

[2]  These services are identified in both Registration No. 3013235 and Registration No. 2851917 for the word mark JOBDIVA.

The Board's fundamental error is reflected in its misplaced admonition to JobDiva that it "confuses the service of providing a software solution for personnel placement and recruitment with actually rendering personnel placement and recruitment services." April 16, 2015 Bd. Dec. at A0016. While the Board thus concedes that JobDiva provides "a software solution for personnel placement and recruitment," it ignores the obvious commercial reality, pervasive throughout the record, that JobDiva in fact provides personnel placement and recruitment services through its software. JobDiva's delivery of its services in this manner does not detract in any way from the essential nature and purpose of its services. As is clear from the evidence, JobDiva finds and places people in jobs and provides personnel staffing services for others using technology. The JOBDIVA Marks are clearly used in commerce for personnel placement and recruitment services and the Board's finding of abandonment must therefore be reversed.

## III.    Statement of Facts

The record includes uncontroverted evidence that JobDiva actively provides the following services, as described in the testimony of JobDiva's Chief Executive Officer, Diya Obeid, and in website printouts of record:

1)    Collecting, reviewing, and analyzing job candidate resumes for specified job openings and identifying, selecting, and recommending the best candidates for available client job openings:

- JobDiva's CEO testified that JobDiva finds resumes "on behalf of employers who are subscribing to these job boards, so it's almost like an outsource function that JobDiva performs in the recruiting process." A0223;

- "JobDiva replaces a tedious manual search [for resumes], data entry and maintenance process.  It also replaces manual sourcing and other sourcing processes" thus obviating the need to "wait for [human job] sourcers to troll the Internet for resumes."  A0462-63;

2)    Evaluating for its clients the qualifications of candidates who have expressed interest in a specific position:

- "[L]et JobDiva tell you if the job's requirements and the candidate's resume match."  A0393.

3)    Helping clients advertise and promote job openings:

- JobDiva's "[candidate] portal pushes your open jobs out to the world, giving you effectively free advertising, while simultaneously drawing fresh candidates into your database." A0396;

- "JobDiva also advertises [a client's] selected jobs on [a client's] own website."  A0433; *see also* A0174.

4)    Communicating directly with job candidates who apply to JobDiva's clients' open positions, recommending particular jobs based on the skillsets demonstrated in their resumes and pointing out employment history issues reflected in their resumes:

- JobDiva's candidate "portal displays to a visiting candidate the job requisitions that the company has, enables the candidate to apply to these jobs and the portal interacts with the candidate, so, for instance, the portal will be able to analyze the candidate's resume and give him feedback on his resume, the portal is also able to analyze the candidate's resume and display to him the best jobs that the company, the best openings that the company has that might be suited for him based on his resume and based on the requirements of the jobs." A0221;

- JobDiva "questions [candidates] on inconsistencies in [their]

job [histories]" and "highlights if there are gaps in [a candidate's] resume" with respect to "the chronology of the work history." A0221-22;

- Candidates who have uploaded resumes can ask through JobDiva which "of those hundreds of jobs that this company has, which ones do you believe might be suited for me, so [JobDiva] focuses him on the ones that are more suited for him." A0222;

- "[Candidates] can also search for 'ideal' jobs, letting JobDiva evaluate their resume against all open jobs in the system and suggest possible fits." A0398.

5) JobDiva tracks and manages communications between job applicants and prospective employers, a key part of the recruitment process that would otherwise need to handled manually:[3]

- JobDiva provides a "candidate portal" that can be embedded in a corporate human resources website and that allows candidates applying for positions to view and apply for jobs directly through the website. A0220-21.

- JobDiva provides job requisition and fulfillment services, *see*

---

[3] *See* A0215-16; *see also* A0121-25. A detailed description of each aspect of the services offered by Petitioner under the JOBDIVA marks is also set forth in A0381-A0494.

A0217; A0218; A0223, which would otherwise need to be provided by a recruiter or personnel placement service.

Appellee introduced no specific evidence of nonuse of the JOBDIVA Marks for personnel placement and recruitment services, but instead referred generally to Mr. Obeid's testimony and to the nature of JobDiva's services.

## SUMMARY OF ARGUMENT

The record in this case compels the conclusion that JobDiva has continuously used the JOBDIVA Marks for personnel placement and recruiting services. The Board mischaracterized JobDiva's services as consisting solely of the "provision of software" and drew an artificially sharp distinction between software and "finding and placing people in jobs at other companies or providing personnel staffing services for others." April 16, 2015 Bd. Dec. at A0012-13, A0014-15. In making this artificial distinction, the Board elevated form over substance in a most extreme fashion that does not square with the obvious commercial reality reflected in the record – namely, that JobDiva, primarily through its software clearly provides personnel placement and recruitment services for others.

## ARGUMENT

### I.    Standard of Review

Abandonment is a question of fact. *On-Line Careline, Inc. v. Am. Online,*

*Inc.*, 229 F.3d 1080, 1087 (Fed. Cir. 2000). "[T]he appropriate standard of review for PTO findings of fact is the 'substantial evidence' standard." *Id.* at 1085 (citing *In re Gartside*, 203 F.3d 1305, 1315 (Fed. Cir. 2000)). "Substantial evidence is 'more than a mere scintilla' and 'such relevant evidence as a reasonable mind would accept as adequate' to support a conclusion." *Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1355 (Fed. Cir. 2009) (citing *In re Pacer Tech.*, 338 F.3d 1348, 1349 (Fed. Cir. 2003); *Consol. Edison v. NLRB*, 305 U.S. 197, 229 (1938)). Furthermore, "[m]ere uncorroborated hearsay or rumor does not constitute substantial evidence." *On-Line Careline*, 229 F.3d at 1086 (quoting *In re Gartside,* 203 F.3d at 1312). "Considered to be less deferential than the 'arbitrary, capricious' standard, 'substantial evidence' necessitates a stricter judicial review of agency factfinding." *On-Line Careline*, 229 F.3d at 1085 (citing *In re Gartside*, 203 F.3d at 1312; *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 490 (1951); *Dickinson v. Zurko,* 527 U.S. 150, 162 (1999)).

Appellant respectfully submits that the Board's finding of abandonment cannot survive scrutiny under the applicable standard of review.

## II.     The Board's Finding of Abandonment is Not Supported by Substantial Evidence

"Since service mark registrations are presumed valid, the party seeking cancellation of such registration must rebut this presumption by a preponderance of the evidence." *On-Line Careline*, 229 F.3d at 1087 (citing *Martahus v. Video*

*Duplication Serv., Inc.*, 3 F.3d 417, 421 (Fed. Cir. 1993); *Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc.*, 892 F.2d 1021, 1023 (Fed. Cir. 1989)).  "The party seeking cancellation [can] establish[] a prima facie case of abandonment by showing proof of nonuse for three consecutive years." *On-Line Careline*, 229 F.3d at 1087 (citing 15 U.S.C. § 1127).  "The burden of persuasion, however, always remains with the [challenger] to prove abandonment by a preponderance of the evidence." *Crash Dummy Movie, LLC v. Mattel, Inc.*, 601 F.3d 1387, 1391 (2010) (quoting *On-Line Careline*, 229 F.3d at 1087).  **Here, Appellee could point to no specific evidence of nonuse  -- there being no such evidence -- but instead made only general reference to JobDiva's services and urged upon the Board a distorted view of those services**.

It should be noted that the Board cited *In re DSM Pharmaceuticals, Inc.* in support of its decision, but the language from the *DSM Pharmaceuticals* case cited by the Board in the present case is clearly inapposite.   The Board cited *DSM Pharmaceuticals* for the proposition that "[a] term that *only* identifies a computer program does not become a service mark merely because the program is sold or licensed in commerce."  87 U.S.P.Q.2d 1623, 2008 WL 2385957 (TTAB 2008).  In the present case, there is no question that the JOBDIVA marks are used as service marks; only the particular services are at issue.

Notably, the Board in *DSM Pharmaceuticals* also stated that: "if a mark is used to identify *both* the system or process *and* the services rendered by means of the system or process, the designation may be registrable as a service mark." *Id.* at *2 (citing *Liqwacon Corp. v. Browning-Ferris Industries, Inc.,* 203 U.S.P.Q. 305, 1979 WL 24857 (TTAB 1979)). This is exactly the situation in the present case, because the JOBDIVA Marks are used and registered for both a software-based system and the services provided via that system.

More on point is the Board's decision in *In re Ancor Holdings,* 79 U.S.P.Q.2d 1218, 2006 WL 1258813 (TTAB 2006). In that case, an Examiner had taken the position that a use specimen failed to show use of a mark for "reminder services in the area of upcoming important dates and events; personal scheduling services provided via the Internet." *Id.* at *3. In that Examiner's view, the specimen showed use only for "software that is used in the performance of the services, but not as a source indicator for the services themselves." *Id.* at *2. The Board rejected the Examiner's contention and made the following observation of particular relevance in the present case:

> Although it may well be software that is generating the reminders and scheduling, **in today's commercial context if a customer goes to a company's website and accesses the company's software to conduct some type of business, the company may be rendering a service, even though the service utilizes software**. Because of . . . the blurring between services and products that has occurred with the development and growth of web-based products and services, **it is important to review all the**

**information in the record to understand both how the mark is used and how it will be perceived by potential customers**.

*Id.* at *3.

The Board in the present case was not called upon to evaluate use specimens as in an *ex parte* case. There is ample information in the record making unmistakably clear that JobDiva's entire business is focused on personnel placement and recruitment services, and further, that numerous, multi-faceted services provided under the JOBDIVA Marks both comprise and are closely intertwined with personnel placement and recruitment services. This record plainly cannot support a finding of nonuse for any period of time, let alone abandonment.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the foregoing reasons, Appellant respectfully requests that this Court reverse the Board's finding of abandonment of the JOBDIVA Marks for "personnel placement and recruitment services."


DATED:  November 2, 2015          Respectfully submitted,

                                  GREENBERG TRAURIG, LLP

                                  By: /s/ Daniel I. Schloss
                                  Daniel I. Schloss
                                  Masahiro Noda
                                  GREENBERG TRAURIG, LLP
                                  200 Park Avenue
                                  New York, New York 10166
                                  Tel: (212) 801-2256
                                  *Attorneys for Appellant*

**ADDENDUM**

> **This Opinion is Not a Precedent of the TTAB**

Mailed: April 16, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*JobDiva, Inc.*
*v.*
*Jobvite, Inc.*

_____

Cancellation No. 92050828

_____

Daniel I. Schloss of Greenberg Taurig, LLP for JobDiva, Inc.

Martin R. Greenstein of Techmark a Law Corporation for Jobvite, Inc.

_____

Before Taylor, Mermelstein and Bergsman,
    Administrative Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:

JobDiva, Inc. ("Petitioner") has petitioned to cancel Registration No. 3103253 owned by Jobvite, Inc. ("Respondent") for the mark JOBVITE (standard characters) for "providing employment-related services via an online website, namely, providing employment and career information, providing job referral, posting and listing services, and providing business networking services including arranging business introductions," in Class 35.[1]

---

[1] Issued June 13, 2006; Section 8 affidavit accepted. The registration was based on application Serial No. 78522998 filed on November 25, 2004 under Section 1(a) of the

As grounds for cancellation, Petitioner alleged that Respondent's mark so resembles Petitioner's mark JOBDIVA, used and registered for "providing end-to-end personnel placement, recruitment and applicant tracking solutions to large and mid-sized staffing organizations worldwide, including in the United States … includ[ing] a workflow system and process delivered as a service enabling staffing companies to swiftly cultivate the wealth of information that is available today through the Internet" as to be likely to cause confusion under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d).[2] Petitioner pleaded ownership of the two registrations listed below:

1. Registration No. 2851917 for the mark JOBDIVA (typed drawing) for "personnel placement and recruitment," in Class 35;[3] and

2. Registration No. 3013235 for the mark JOBDIVA and design, shown below for "personnel placement and recruitment services; computer services, namely, providing databases featuring recruitment and employment, employment advertising, career information and resources, resume creation, resume

---

Trademark Act of 1946, 15 U.S.C. § 1051(a), based upon Applicant's claim of first use anywhere as of May 31, 2004 and use in commerce as of November 23, 2004.

[2] Petition for Cancellation ¶¶ 1, 2, and 11 (1 TTABVUE 3, 4 and 5). Citations to the record in this opinion are to the TTABVUE docket entry number and the electronic page number where the document or testimony appears. Because the Board primarily uses TTABVUE in reviewing evidence, the Board prefers that citations to material or testimony in the record that has not been designated confidential include the TTABVUE docket entry number and the TTABVUE page number. For material or testimony that has been designated confidential and which does not appear on TTABVUE, the TTABVUE docket entry number where such material or testimony is located should be included in any citation. *See Turdin v. Trilobite, Ltd.*, 109 USPQ2d 1473, 1476 n.6 (TTAB 2014).

[3] Issued June 8, 2004; renewed. Prior to November 2, 2003, "standard character" drawings were known as "typed" drawings. A typed mark is the legal equivalent of a standard character mark. TMEP § 807.03(i) (January 2015).

transmittals and communication of responses thereto via a global computer network," in Class 35.[4]



Petitioner also alleged that Respondent committed fraud on the USPTO by knowingly making false statements during the prosecution of its application for registration by stating that it had used its mark in connection with all of the services listed in the description of services when it was not using the mark in connection with all of the services.[5] Specifically, Petitioner contends that at the time Respondent filed its application, Respondent was not using its mark in connection with "posting and listing services."[6]

Respondent, in its Answer, denied the salient allegations in the Petition for Cancellation and asserted the affirmative defense of laches. Respondent also filed a Counterclaim to Cancel Petitioner's pleaded registrations on the ground that Petitioner does not provide personnel placement and recruitment services and has abandoned the use of its mark in connection with those services.

Petitioner, in its Reply to the Counterclaim, denied the salient allegations in the counterclaim.

---

[4] Issued November 8, 2005; Section 8 affidavit accepted.

[5] 1 TTABVUE 6-7.

[6] Petitioner's Brief, p. 15 (91 TTABVUE 21).

I.    Preliminary Issue

A.  Numerous objections lodged by the parties.

The parties have lodged numerous objections. None of the evidence sought to be excluded is outcome determinative. Moreover, the Board is capable of weighing the relevance and strength or weakness of the objected-to testimony and evidence, including any inherent limitations, and this precludes the need to strike the testimony and evidence. Given these facts, coupled with the number of objections, we see no compelling reason to discuss the specific objections in detail. As necessary and appropriate, we will point out any limitations applied to the evidence or otherwise note that the evidence cannot be relied upon in the manner sought. We have considered all of the testimony and evidence introduced into the record. In doing so, we have kept in mind the various objections raised by the parties and we have accorded whatever probative value the subject testimony and evidence merit.

B.  Whether Respondent's claim, raised in its brief, that Petitioner's application for the registration of JOBDIVA (typed drawing) was void *ab initio* was tried by implied consent?

In its brief, Respondent identified the issues in this proceeding as including "[d]oes the fact that a third party, rather than Petitioner, applied for the JOBDIVA Mark, with the intent to 'reserve' it for Petitioner, make the JOBDIVA Registration void *ab initio* such that it should be cancelled?[7] Petitioner objected to Respondent's attempt to introduce this unpleaded claim for the first time in Respondent's Brief:[8]

---

[7] Respondent's Brief, p. 12 (96 TTABVUE 14).

[8] Petitioner's Reply Brief in the Cancellation and Responsive Brief in the Counterclaim, p. 13 (98 TTABVUE 17).

Petitioner has had no notice that Respondent intended to include an additional claim of lack of bona fide intent until it received Respondent's Trial Brief, well after the close of discovery. As Petitioner has had no opportunity to take additional discovery or present additional evidence on this issue, Petitioner would therefore be severely prejudiced by the consideration of this new claim. Therefore, the allegations related to Petitioner's bona fide intent to use are not properly before the Board and the related portions of Respondent's brief should be disregarded.[9]

Respondent argues that testimony on the issue was taken without objection by Petitioner and that Petitioner had an opportunity to present arguments on the issue citing to Petitioner's Reply Brief at page 30, footnote 40.[10]

---

[9] *Id.*

[10] Respondent's Reply Brief, p. 5 (100 TTABVUE 7). The reference to Petitioner's Reply Brief at page 30, footnote 40, may be found at 98 TTABVUE 17. Petitioner's argument is set forth below:

It is noted that Respondent's claim based upon a lack of bona fide intent is unsupported by the record of this case. The application for the JOBDIVA mark of Registration No. 2,851,917 was originally filed by Algomod Technologies Corporation ("Algomod") in August 2002 on an intent-to-use basis. Petitioner's First Not of Rel. Registration No. 2,851,917 was issued on June 8, 2004. *Id.* [75 TTABVUE 6-7]. Until November 2004, Algomod licensed the mark to JobDiva, Inc., a separate corporate entity that was under common ownership and operated with Algomod. See Obeid Dep. at 42:15-25 [82 TTABVUE 46]. On November 1, 2004, Algomod assigned Registration No. 2,851,917 to Petitioner. See Petitioner's First Not. of Rel. [75 TTABVUE 7]. Petitioner's bona fide intent to use the JOBDIVA mark at the time the application was filed is evidenced, among other ways, by the facts that (1) Algomod, through its related "sister" company, JobDiva, used the JOBDIVA mark from May 2003 until November 2004 and (2) Petitioner has continuously used the JOBDIVA mark in commerce since November 2004.

- 5 -

"Implied consent to the trial of an unpleaded issue can be found only where the nonoffering party (1) raised no objection to the introduction of evidence on the issue, and (2) was fairly apprised that the evidence was being offered in support of the issue." TBMP § 507.03(b) (June 2014). *See also Morgan Creek Productions Inc. v. Foria International Inc.,* 91 USPQ2d 1134, 1138 (TTAB 2009); *H.D. Lee Co. v. Maidenform Inc.,* 87 USPQ2d 1715, 1720-1721 (TTAB 2008); *Long John Silver's Inc. v. Lou Scharf Inc.,* 213 USPQ 263, 266 n.6 (TTAB 1982) (applicant's objection to the introduction of evidence regarding an unpleaded issue obviated the need to determine whether the issue had been tried by implied consent); *Boise Cascade Corp. v. Cascade Coach Co.,* 168 USPQ 795, 797 (TTAB 1970) ("Generally speaking, there is an implied consent to contest an issue if there is no objection to the introduction of evidence on the unpleaded issue, as long as the adverse party was fairly informed that the evidence went to the unpleaded issue").

> The question of whether an issue was tried by consent is basically one of fairness. The non-moving party must be aware that the issue is being tried, and therefore there should be no doubt on this matter.

*Morgan Creek Productions Inc. v. Foria International Inc.,* 91 USPQ2d at 1139.

Respondent elicited the underlying testimony regarding Respondent's claim that Registration No. 2851917 for the mark JOBDIVA (typed drawing) is void *ab initio* during the cross-examination of Diya Obeid, Petitioner's Chief Executive Officer.[11]

Petitioner's counsel objected to Respondent's questions regarding the ownership of

---

[11] We are cognizant that Petitioner's counsel opened the door to this line of questioning by asking Mr. Obeid, on direct, to explain why he separately incorporated JobDiva. (82 TTABVUE 13). Respondent's counsel was following-up on this line of questioning during the cross-examination of the witness.

Axelon, formerly known as Algomod, a company owned by Diya Obeid, on the ground that "[t]here is no issue in the case that goes to ownership of other entities."[12] Petitioner's counsel inquired "[w]here are you going with this?" There was a discussion off the record and then the cross examination proceeded.[13] Petitioner's counsel never objected to the line of questioning on the specific ground that the ownership or validity of the registration was not a pleaded issue. On redirect, Petitioner's counsel questioned Mr. Obeid regarding his control over the quality and nature of the services rendered under the JOBDIVA mark while that mark was owned by Algomod Technologies Corporation.[14]

Petitioner's counsel did not object to Respondent's line of questions on the ground that they were irrelevant because the issue of whether Petitioner's application for the registration of JOBDIVA (typed drawing) was void *ab initio* had not been pleaded. Nevertheless, Petitioner's counsel did lodge an objection because, in his opinion, there was no issue as to the "ownership of other entities," a seemingly different reason from Respondent's unpleaded void *ab initio* claim. This objection on a different ground suggests that Petitioner's counsel did not know what issue Respondent was getting at during its cross-examination. To clarify exactly why Respondent was pursing that line of questioning, Respondent could have informed Petitioner that Respondent was putting Petitioner on notice that Respondent was inquiring whether Petitioner had a *bona fide* intent to use the

---

[12] 82 TTABVUE 39-40.

[13] 82 TTABVUE 40.

[14] 82 TTABVUE 136- 137.

JOBDIVA mark in connection with personnel placement and recruitment when Algomod Technologies Corporation filed the application.[15] *See Morgan Creek Productions Inc. v. Foria International Inc.,* 91 USPQ2d at 1138.

As noted above, since the question of whether an issue was tried by implied consent is one of fairness, we cannot find, on this record, that Petitioner was on notice that the cross-examination was intended to try the issue of whether the registration for the mark JOBDIVA (typed drawing) was void *ab initio.* Petitioner's objection to the claim that the application for the mark JOBDIVA (typed drawing) was void *ab initio* is sustained.

## II.  The Record

The record includes the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), Respondent's registration file and the registration files of Petitioner's pleaded registrations that are the subject of the counterclaim.

A.  Petitioner's testimony and evidence.

1.  Notice of reliance on copies of Petitioner's pleaded registrations printed from the electronic database of the USPTO showing the current status of and title to the registrations;[16]

---

[15] Of course it is possible that counsel discussed the matter in their off-the-record colloquy during Mr. Obeid's cross-examination. But neither of them claim this happened, and in any event, the facts supporting Petitioner's express or implied consent to trial of the new issue are not apparent on the record.

The better practice, in a situation where the basis for a new ground becomes evident during a testimony deposition, is to file a motion to amend the pleadings pursuant to Fed. R. Civ. P. 15(a), rather than to rely on answers adduced during cross-examination or redirect examination to show that an unpleaded issue was tried by consent. Such a motion, however, must be filed as soon as the basis therefor is known in order to be considered timely.

2.   Notice of reliance on a copy of the prosecution history file for Registration No. 3095138 for the mark FORUMJOBS (cancelled December 28, 2012);[17]

3.   Notice of reliance on the following documents:

  a.     Dictionary definitions of the word "vite";[18]

  b.     Excerpts from Petitioner's website;[19]

  c.     Excerpts from Respondent's website;[20]

  d.     Copy of the Whois registration information for Respondent's url;[21]

  e.     Copy of webpages from the Wayback machine depicting a third-party's use of the term "Jobvite";[22]

4.   Notice of reliance on excerpts from the discovery deposition of Dan Finnigan, Respondent's Chief Executive Officer;[23]

5.   Notice of reliance on excerpts from the discovery deposition of Jesper Schultz, the co-founder of Respondent and former Chief Executive Officer;[24]

---

[16] 75 TTABVUE.

[17] 76 TTABVUE.

[18] 77 TTABVUE 7-17.

[19] 77 TTABVUE 20-101.

[20] 77 TTABVUE 103-143.

[21] 77 TTABVUE 145.

[22] 77 TTABVUE 149. The webpage is in French and Petitioner failed to provide an English translation. We did not consider the foreign website because there is no basis for us to assume that it would be encountered by the relevant U.S. consumers. *See Stuart Spector Designs, Ltd. v. Fender Musical Instruments Corp.*, 94 USPQ2d 1549, 1552 (TTAB 2009) (striking from evidence excerpts from foreign publications which were not shown to be in general circulation in the United States). Further, because this panel does not speak or read French, the webpage printed in French has no probative value. *Hard Rock Cafe Licensing Corp. v. Elsea*, 48 USPQ2d 1400, 1405 (TTAB 1998) (objections sustained as to documents not in English).

[23] 78 TTABVUE.

6. The testimony deposition of Diya Obeid, Petitioner's Chief Executive Officer, with attached exhibits;[25] and

7. Notice of reliance on a copy of Petitioner's website offered to show the services purportedly performed under the JOBDIVA trademark.[26]

B. Respondent's testimony and evidence.

1. Notice of reliance on the following items:[27]

    a.    Petitioner's responses to Respondent's interrogatories;[28]

    b.    Copies of the USPTO electronic database records of Petitioner's applications and registrations;[29]

    c.    Copies of third-party registrations incorporating the word "job" in connection with employment and recruiting services where the exclusive use of the word "job" has been disclaimed;[30]

    d.    Copies of third-party websites advertising employment and recruiting services where the word "job" is incorporated as part of the trademark or trade name of the entity offering the services;[31]

---

[24] 79 TTABVUE.

[25] 82 TTABVUE. The version of Mr. Obeid's deposition with testimony designated as confidential was filed at 81 TTABVUE. Any confidential testimony or evidence referenced in the decision will be so noted.

[26] 90 TTABVUE.

[27] Respondent also attached excerpts from the testimony deposition of Diya Obeid. Because Petitioner's testimony deposition is already of record, Respondent's proffer is duplicative and unnecessary. Once a testimony deposition has been made of record by one party, it may be referred to by any party for any purpose permitted by the Federal Rules of Evidence. *See Dynamark Corp. v. Weed Eaters, Inc.,* 207 USPQ 1026, 1028 n.6 (TTAB 1980)**.**

[28] 85 TTABVUE 8-14.

[29] 85 TTABVUE 16-36.

[30] 85 TTABVUE 38-295.

e.      Dictionary definitions of the word "job";[32]

f.      Excerpts from Petitioner's website offered to show that the word "job" is descriptive when used in connection with employment and recruiting services;[33]

g.      Copies of news articles about job, employment, and recruiting products featuring "job-formative" marks offered to show that the word "job" is descriptive when used in connection with employment and recruiting services;[34]

h.      Copies of news articles by Joyce Lain Kennedy, a freelance journalist, offered to demonstrate her longstanding knowledge regarding Respondent's services;[35]

i.      Excerpts from the discovery deposition of Jesper Schultz, with Petitioner's consent;[36]

j.      Declaration of Hans Larsen, a co-founder of Respondent, with Petitioner's consent, authenticating archival webpages from Respondent's website offered to show the commercial impression engendered by Respondent's mark;[37]

k.      Copies of webpages from trade shows offered to show the market interface between the parties;[38] and

---

[31] 85 TTABVUE 297-391.

[32] 85 TTABVUE 393-394.

[33] 85 TTABVUE 396-415.

[34] 85 TTABVUE 417-457.

[35] 85 TTABVUE 459-462. Petitioner referenced an encounter with Ms. Kennedy at a personnel recruiter trade show as evidence of actual confusion.

[36] 85 TTABVUE 466-502.

[37] 85TTABVUE 508-524.

[38] 86 TTABVUE 8-35.

- 11 -

1.    Copies of news articles from 2006-2011 referencing Respondent;[39] and

2.  Testimony deposition of Dan Finnigan, Respondent's Chief Executive Officer,

with attached exhibits.[40]

## III.    The Counterclaim

### A. Standing

Respondent has standing based on Petitioner's assertion of its registrations

against Respondent in Petitioner's petition to cancel Respondent's registration. *See*

*Ohio State University v. Ohio University*, 51 USPQ2d 1289, 1293 (TTAB 1999)

("[A]pplicant's standing to assert the counterclaim arises from applicant's position

as a defendant in the opposition and cancellation initiated by opposer").

### B. Whether Petitioner has abandoned its marks in connection with "personnel placement and recruitment?

Registration No. 2851917 for the mark JOBDIVA (typed drawing) is registered

for "personnel placement and recruitment."

Registration No. 3013235 for the mark JOBDIVA and design is registered, *inter*

*alia,* "personnel placement and recruitment."

Respondent argues that Petitioner has never used its JOBDIVA marks in

connection with personnel placement and recruitment.[41] Petitioner, to the contrary,

---

[39] 86 TTABVUE 37-921.

[40] 89 TTABVUE. A version of Mr. Finnigan's deposition with some of the testimony designated as confidential was filed at 88 TTABVUE. Any confidential testimony or evidence referenced in the decision will be so noted.

[41] Respondent's Brief, p. 51 (96 TTABVUE 53).

contends that it has continuously rendered personnel placement and recruitment services. The essence of Petitioner's argument is set forth below:

> Petitioner's CEO testified that Petitioner uses the JOBDIVA Marks for applicant tracking and contact relationship management to track and manage communications with job applicants. Petitioner also provides a "candidate portal" that can be embedded in a corporate HR website and which allows candidates applying for positions to view and apply for jobs directly through the website. Petitioner's CEO also provided detailed testimony describing JOBDIVA job requisition, resume harvesting, fulfillment and procurement services, all of which constitute personnel placement and recruitment.
>
> Petitioner's website further describes the personnel placement and recruitment services provided under the JOBDIVA Marks. For example, JOBDIVA provides a software as a service ("SaaS") automated recruitment technology with a wide range of recruiting and placement services, including, employment candidate contact relationship management, employment candidate portal communication, flexible or per diem staffing services, and resume harvesting, among others.[42]

The word "personnel" is defined, *inter alia*, as "a department within a company or organization that deals with the people who work for it."[43] The word "placement" is defined, *inter alia,* as "the assignment of a person to a suitable place (as a job or a class in school."[44] The word "recruitment" is defined as "the action or process or

---

[42] Petitioner's Reply Brief, p. 12 (99 TTABVUE 16).

[43] *Merriam-Webster* online dictionary (merriam-webster.com). The Board may take judicial notice of dictionary definitions, including online dictionaries that exist in printed format. *In re Cordua Rests. LP*, 110 USPQ2d 1227, 1229 n.4 (TTAB 2014); *Threshold.TV Inc. v. Metronome Enters. Inc.*, 96 USPQ2d 1031, 1038 n.14 (TTAB 2010).

[44] *Id.*

recruiting."[45] "Recruit" is defined as "to find suitable people to get them to join a company, an organization, the armed forces, etc."[46] "Personnel placement and recruitment" in Petitioner's description of services means that Petitioner is finding and placing people in jobs at other companies or providing personnel staffing services for others.

In his testimony, Diya Obeid, Petitioner's Chief Executive Officer, described JOBDIVA as "an applicant tracking system for recruiting departments, [and] for HR departments seeking to staff people."[47] Obeid's deposition Exhibit 1 is an excerpt from the JOBDIVA website outlining "the product features and capabilities."[48] Exhibit 1 identifies JOBDIVA as staffing and recruiting software.[49] The website states the following:

> JOBDIVA INTRODUCTION
>
> - JobDiva is an end-to-end talent management system
>
> - JobDiva is delivered as a service
>
> - JobDiva boots an organization's capacity to service client needs

The reference to "service" is providing software as a service. In this case, Petitioner's provision of software is consistent with the computer services identified in Petitioner's registration: "computer services, namely, providing databases

---

[45] *Id.*

[46] *Id.*

[47] 82 TABVUE 14.

[48] 82 TTABVUE 16 and 170-174.

[49] 82 TTABVUE 170.

featuring recruitment and employment, employment advertising, career information and resources, resume creation, resume transmittals and communication of responses thereto via a global computer network." There is no reference on Petitioner's web site to Petitioner's performance of personnel placement and recruitment services other than supplying Petitioner's software.

Likewise, Exhibit 2 from Mr. Obeid's deposition is another excerpt from Petitioner's website.[50] It further references the JOBDIVA software capabilities without reference to Petitioner performing personnel placement or recruitment services other than supplying Petitioner's software.

Petitioner introduced an excerpt from its website through a notice of reliance identifying JOBDIVA as software in the field of personnel placement and recruitment but not a personnel placement and recruitment service performed by Petitioner.[51]

OVERVIEW

JobDiva is a full-service provider of the end-to-end JobDiva recruitment and applicant tracking platform to large and mid-sized staffing organizations. JobDiva's outlook on the recruiting and staffing industry is as distinctive as the innovative technology that drives its success.

As indicated above, Petitioner contends that it has not abandoned its use of the mark JOBDIVA for personnel placement and recruitment services because by providing a personnel placement and recruitment software application for use by

---

[50] 82 TTABVUE 22 and 175-179.

[51] 77 TTABVUE 98. In its April 28, 2014 rebuttal notice of reliance, Petitioner introduced yet another printout of its website to "show the use of JobDiva's marks for its services." (90 TTABVUE 2). Again, the materials show that JOBDIVA is software in the field of personnel placement and recruitment but not a personnel and recruitment service performed by Petitioner.

others, Petitioner concludes that it is rendering personnel placement and recruitment services. However, Petitioner confuses the service of providing a software solution for personnel placement and recruitment with actually rendering personnel placement and recruitment services.[52]

According to Section 45 of the Trademark Act, 15 U.S.C. § 1125,

> [a] mark shall be deemed to be 'abandoned' … [w]hen its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. *Nonuse for 3 consecutive years shall be prima facie evidence of abandonment.*

(emphasis added). Further,

> [t]he term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark.

Since there is no evidence of use of Petitioner's marks in connection with "personnel placement and recruitment" services, there has been nonuse for three consecutive years, constituting *prima facie* evidence of abandonment. Petitioner submitted no evidence that it has used its mark in connection with the services, or that it intends to resume such use. In view thereof, we find that Petitioner has abandoned its use of the JOBDIVA marks in connection with "personnel placement

---

[52] The original specimen submitted to support Petitioner's applications for registration for "personnel placement and recruitment," while not unambiguous, might possibly be interpreted as referring to personnel placement and recruitment activities performed by Petitioner under the JOBDIVA mark. However, "[s]pecimens in the file of an application for registration, or in the file of a registration, are not evidence on behalf of the applicant or registrant unless identified and introduced into evidence as exhibits during the period for taking testimony." Trademark Rule 2.122(b)(2), 37 C.F.R. § 2.122(b)(2). But even if the specimens were evidence on behalf of Petitioner, and even if we concluded that they showed Petitioner's provision of personnel placement and recruitment, there is no evidence of Petitioner's use of JOBDIVA to identify "personnel placement and recruitment" services, since those specimens were filed on July 21, 2004.

and recruitment" and the Counterclaim to Cancel Registration No. 2851917 and the Counterclaim to Partially Cancel Registration No. 3013235 are granted.

Registration No. 2851917 will be cancelled in due course and Registration No. 3013235 will be amended pursuant to Section 18 of the Trademark Act, 15 U.S.C. § 1068, to delete "personnel placement and recruitment."[53]

## IV.    The Petition for Cancellation

Having granted Respondent's counterclaim as to one of Petitioner's pleaded registrations and counterclaim to partially cancel the other registration, we now consider Petitioner's claims of likelihood of confusion and fraud solely based on Petitioner's Registration No. 3013235 for "computer services, namely, providing databases featuring recruitment and employment, employment advertising, career information and resources, resume creation, resume transmittals and communication of responses thereto via a global computer network."[54]

---

[53] Section 18 of the Trademark Act provides that in an *inter partes* proceeding "the Director may refuse to register the opposed mark, may cancel the registration, in whole or in part, may modify the application or registration by limiting the goods or services specified therein, may otherwise restrict or rectify with respect to the register the registration of a registered mark, may refuse to register any or all of several interfering marks, or may register the mark or marks for the person or persons entitled thereto, as the rights of the parties under this chapter may be established in the proceedings."

[54] Because the Counterclaim to Cancel Registration No. 2851917 has been granted, the cancelled registration no longer has any probative value. A cancelled or expired registration has no probative value other than to show that it once issued. *See In re Kysela Pere et Fils Ltd.,* 98 USPQ2d 1261, 1264 (TTAB 2011) ("of course, third-party applications have no probative value except to show that an application has been filed, and "dead" or cancelled registrations have no probative previous value at all.").

A.  Standing

Petitioner introduced a copy of Registration No. 3013235 for the mark JOBDIVA

and design printed from the USPTO electronic database showing the status of and

title to the registration.[55] Because Petitioner has properly made of record its

pleaded registration, Petitioner has established its standing. *Cunningham v. Laser

Golf Corp.,* 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000); *Lipton Industries,

Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982).

B.  Priority

In a cancellation proceeding in which both parties own registrations, Petitioner

must, in the first instance, establish prior rights in the same or similar mark, and

Respondent can in turn defeat Petitioner's claim by establishing that, as between

the parties, Respondent possesses prior rights in the mark sought to be canceled.

> Of course, Petitioner or Respondent may rely on its
> registration for the limited purpose of proving that its
> mark was in use as of the application filing date. Thus, a
> petitioner -- whose application filing date was earlier than
> respondent's application filing date -- could take its
> chances and elect to make of record simply a copy[ ] of its
> registration. Trademark Rules 2.122(d)(1) and 2.122(d)(2).
> By so doing, Petitioner's proven first use date of its mark
> would then be the filing date of the application. However,
> if Respondent proves an actual first use date pre-dating
> Petitioner's filing date, the issue of priority, and hence
> Petitioner's Section 2(d) claim, would be resolved in favor
> of Respondent.

*Brewski Beer Co. v. Brewski Brothers Inc.*, 47 USPQ2d 1281, 1284 (TTAB 1998)

---

[55] 75 TTABVUE 8-9.

The filing date of Petitioner's application Serial No. 78454470, which issued as Registration No. 3013235 for the mark JOBDIVA and design, was July 21, 2004. The filing date of Respondent's application Serial No. 78522998, which issued as the registration sought to be cancelled, was November 25, 2004. Respondent did not proffer any testimony or evidence to establish an earlier date of first use. In fact, Respondent, in its brief, did not contest Petitioner's priority.

We find that Petitioner has established its priority with respect to the mark JOBDIVA and design for "computer services, namely, providing databases featuring recruitment and employment, employment advertising, career information and resources, resume creation, resume transmittals and communication of responses thereto via a global computer network."

C. Likelihood of Confusion.

Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion. *In re E. I. du Pont de Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973). *See also In re Majestic Distilling Co., Inc.,* 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the services. *See Federated Foods, Inc. v. Fort Howard Paper Co.,* 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks."). These factors, and any

other relevant *du Pont* factors in the proceeding now before us, will be considered in this decision.

    1.  The similarity or dissimilarity and nature of the services.

The description of services in Respondent's registration is "providing employment-related services via an online website, namely, providing employment and career information, providing job referral, posting and listing services, and providing business networking services including arranging business introductions."

The description of services in Petitioner's pleaded registration is "computer services, namely, providing databases featuring recruitment and employment, employment advertising, career information and resources, resume creation, resume transmittals and communication of responses thereto via a global computer network."

The services are essentially identical. The only difference is the manner in which the parties described them.

    2.  The established, likely-to-continue channels of trade and classes of consumers.

Because the services described in the registration sought to be cancelled and in Petitioner's pleaded registration are essentially identical, we must presume that the channels of trade and classes of purchasers are the same. *See In re Viterra Inc.,* 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012) (even though there was no evidence regarding channels of trade and classes of consumers, the Board was entitled to rely on this legal presumption in determining likelihood of confusion); *In*

*re Yawata Iron & Steel Co.*, 403 F.2d 752, 159 USPQ 721, 723 (CCPA 1968) (where there are legally identical goods, the channels of trade and classes of purchasers are considered to be the same); *American Lebanese Syrian Associated Charities Inc. v. Child Health Research Institute,* 101 USPQ2d 1022, 1028 (TTAB 2011).

Also, the testimony and evidence adduced at trial proves that the services at issue move in the same channels of trade and are sold to the same consumers. Prospective users of the online employment and recruiting software applications are in-house human resources departments, independent human resource consultants, and employment recruiters.[56] Specifically, Respondent markets to companies in the market for recruiting software applications.[57] Likewise, Petitioner's JOBDIVA applicant tracking system is designed for use by employment recruiters and human resource departments seeking to place prospective employees (*i.e.,* the hiring manager).[58] Further, both parties were sponsors of the 2013 ERE Recruiting Conference and Expo[59] and the 2013 SourceCon "conference for professional sources."[60]

3. The conditions under which and buyers to whom sales are made, i.e., "impulse" vs. careful, sophisticated purchasing.

---

[56] 85 TTABVUE 475. See also 89 TTABVUE 47, 51 and 75 (the recruiting industry).

[57] 89 TTABVUE 62-63.

[58] 82 TTABVUE 14 and 18.

[59] 89 TTABVUE 472-473.

[60] 89 TTABVUE 493-496.

There was scant testimony and evidence regarding the degree of care exercised by the parties' customers. From the testimony and evidence, we were able to glean the following:

a.    As discussed above, the parties license their recruiting software applications to in-house human resources departments, independent human resource consultants, and employment recruiters;

b.    Sales are through personal contact;[61] and

c.    "Most prospects have done a significant percent of their research about what to buy and what not to buy before they even talk to a vendor now, which is very different than 20 years ago."[62]

Under these circumstances, we can assume that the prospective customers will have a focused need for recruiting software applications; the sales will be conducted in consultation with knowledgeable sales personnel and with close examination by the prospective customers; and prospective customers will compare proposals and competing products. In view of the foregoing, we find that the prospective customers will exercise a high degree of consumer care which will minimize the likelihood of confusion.

4.  The nature and extent of any actual confusion and the length of time during and conditions under which there has been concurrent use without evidence of actual confusion.

As noted above, the parties have concurrently used their marks in connection with identical services rendered in the same channels of trade to the same classes of

---

[61] 82 TTABVUE 133.

[62] 89 TTABVUE 65.

consumers since approximately 2004. As set forth below, the testimony and evidence presented at trial further demonstrates that there have been opportunities for prospective consumers to have encountered both marks.

Respondent has received recognition in the field of recruiting software applications. For example, Respondent has received, *inter alia*, the awards listed below:

a.    Respondent received the 2009 Gartner Cook Vendor Award. "Gartner [Cook] is a very well-respected analyst in the tech vendor evaluation market";[63]

b.    Respondent received the 2010 and 2013 Top HR Product of the Year from Human Resource Executive Magazine.[64] "Any of the top HR product of the year awards are highly respected within the recruitment software industry. They have a panel that's pretty exhaustive in trying to select who wins and who doesn't."[65]

In addition, Respondent has 15,000 twitter followers.[66]

Q.    And is that considered to be a substantial number?

A.    Yes, compared to other providers, not only of recruiting software but even HR software, it's quite a bit relative to them.

My understanding is it's more than most of the software vendors in the industry.[67]

---

[63] 89 TTABVUE 85.

[64] 89 TTABVUE 85 and 501-528.

[65] 89 TTABVUE 85.

[66] 89 TTABVUE 87.

[67] *Id.*

Likewise, Petitioner contends that its reputation has grown over the last ten years.

> Continuously since 2015, Petitioner has invested increasingly substantial amounts of time, money, and effort in its JOBDIVA Services and these efforts have been quite successful. Petitioner makes a significant annual investment in advertising expenditures in connection with JOBDIVA Services. Additionally, Petitioner spends additional resources marketing the JOVDIVA Services at five to six recruiting trade shows in the United States each year. As a result of Petitioner's substantial investments, Petitioner's revenues from the JOBDIVA Services have steadily climbed since 2004 and increased significantly between 2009 and 2013.[68]

Despite the simultaneous use of JOBDIVA and JOBVITE in connection with providing essentially identical services, in the same channels of trade and to the same classes of consumers for ten years, there is evidence of only one instance of arguable confusion:[69] At the 2013 ERE conference, Mr. Obeid was talking with an unidentified employee of Simply Hired in front of the Simply Hired display booth when Joyce Lain Kennedy, a freelance journalist, approached and joined the conversation. When Mr. Obeid identified himself as a JOBDIVA employee, Ms. Kennedy said "Yes, I spoke to your people and some of your differentiators have to

---

[68] 91 TTABVUE 11, citing Diya Obeid's testimony at 81 TTABVUE 27-28 and 180 [designated confidential]. The testimony regarding Petitioner's revenues and advertising expenditures were designated as confidential and, therefore, we may only refer to them in general terms. Although Petitioner did not put its revenues and advertising expenditures in context by referencing market share, Petitioner's revenues are growing and appear indicative of a successful company. With respect to advertising expenditures, Mr. Obeid testified that "we spend aggressively." (81 TTABVUE 27).

[69] Petitioner, in its responses to Respondent's interrogatories, stated that it was unaware of any inquiries regarding an affiliation between the parties or of any instances of confusion. 85 TTABVUE 9-10. The interrogatories were signed February 22, 2011. 85 TTABVUE 13. There is no indication that Petitioner supplemented these responses so we assume that they remained accurate at least through the trial and briefing of the case.

do with social networks."[70] After Mr. Obeid explained to Ms. Kennedy that he was with JOBDIVA, not JOBVITE, Mr. Obeid testified that Ms. Kennedy "showed tremendous confusion and said "Oh, I thought it's the same company or something. Aren't you Jobvite?""[71] Mr. Obeid subsequently confirmed that Ms. Kennedy had not visited the JOBDIVA booth.[72]

The parties have vigorously argued whether Mr. Obeid's testimony regarding what Ms. Kennedy said at the 2013 ERE Conference constitutes inadmissible hearsay.**[73]** Even considering the testimony, we find that one reported instance of confusion over a ten year period when there has been a reasonable opportunity for actual confusion to have occurred weighs against finding that there is a likelihood of confusion.

5. The similarity or dissimilarity of the marks in their entireties in terms of appearance, sound, connotation and commercial impression.

We now turn to the *du Pont* likelihood of confusion factor focusing on the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression. *In re E. I. du Pont De Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973). In a particular case, "two marks may

---

[70] 82 TTABVUE 32.

[71] 82 TTABVUE 33.

[72] 82 TTABVUE 34.

[73] As noted above, Mr. Obeid testified that Ms. Kennedy "showed tremendous confusion." Such statements of the declarant's then-existing state of mind may be an exception to the hearsay rule. Fed. R. Evid. 803(3). In any event, this evidence of confusion would have been more convincing had Ms. Kennedy been called to testify as to whether in fact she was confused and, if so, what caused her confusion. *See Marshall Field, & Co. v. Mrs. Fields Cookies,* 25 USPQ2d 1321, 1327 (TTAB 1992) ("we do not have the benefit of the testimony of the allegedly confused individuals from which to determine what may have been responsible for such confusion").

be found to be confusingly similar if there are sufficient similarities in terms of sound *or* visual appearance *or* connotation." *Kabushiki Kaisha Hattori Seiko v. Satellite Int'l, Ltd.,* 29 USPQ2d 1317, 1318 (TTAB 1991) *aff'd mem.,* 979 F.2d 216 (Fed. Cir. 1992) (emphasis in the original; citation omitted). *See also Eveready Battery Co. v. Green Planet Inc.,* 91 USPQ2d 1511, 1519 (TTAB 2009), *citing Krim-Ko Corp. v. The Coca-Cola Co.,* 390 F.2d 728, 156 USPQ 523, 526 (CCPA 1968) ("It is sufficient if the similarity in either form, spelling or sound alone is likely to cause confusion.").

In comparing the marks, we are mindful that where, as here, the services are identical, the degree of similarity necessary to find likelihood of confusion need not be as great as where there is a recognizable disparity between the services. *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012); *Century 21 Real Estate Corp. v. Century Life of America,* 970 F.2d 874, 23 USPQ2d 1698, 1700 (Fed. Cir. 1992); *Jansen Enterprises Inc. v. Rind,* 85 USPQ2d 1104, 1108 (TTAB 2007); *Schering-Plough HealthCare Products Inc. v. Ing-Jing Huang,* 84 USPQ2d 1323, 1325 (TTAB 2007).

"The proper test is not a side-by-side comparison of the marks, but instead 'whether the marks are sufficiently similar in terms of their commercial impression' such that persons who encounter the marks would be likely to assume a connection between the parties." *Coach Servs. Inc. v. Triumph Learning LLC*, 101 USPQ2d at 1721. *See also San Fernando Electric Mfg. Co. v. JFD Electronics Components Corp.,* 565 F.2d 683, 196 USPQ 1, 3 (CCPA 1977); *Spoons Restaurants Inc. v.*

*Morrison Inc.,* 23 USPQ2d 1735, 1741 (TTAB 1991), *aff'd mem.,* 972 F.2d 1353 (Fed. Cir. 1992). The proper focus is on the recollection of the average customer, who retains a general rather than specific impression of the marks. *L'Oreal S.A. v. Marcon,* 102 USPQ2d 1434, 1438 (TTAB 2012); *Winnebago Industries, Inc. v. Oliver & Winston, Inc.,* 207 USPQ 335, 344 (TTAB 1980); *Sealed Air Corp. v. Scott Paper Co.,* 190 USPQ 106, 108 (TTAB 1975). As discussed above, the parties' usual customers are in-house human resources departments, independent human resource consultants, and employment recruiters who will exercise a high degree of care when making their purchasing decisions regarding licensing the use of a personnel and recruiting software application.

At first blush, the marks are similar because they share the same prefix word "Job." However, because the word "job" is highly descriptive when used in connection with providing software applications in the field of employment recruiting and providing career information, consumers are likely to focus on other features of the marks as an indicator of source. It is well-settled that descriptive matter may have less significance in likelihood of confusion determinations. *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1846 (Fed. Cir. 2000) ("Regarding descriptive terms, this court has noted that the 'descriptive component of a mark may be given little weight in reaching a conclusion on the likelihood of confusion.'") (*quoting In re National Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 752 (Fed. Cir. 1983)); *In re Dixie Rests. Inc.*, 105 F.3d 1405, 1407, 41 USPQ2d 1531, 1533-34 (Fed. Cir. 1997).

While we do not ignore the fact that both marks share the prefix word "Job," we note that there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on a consideration of the marks in their entireties. *In re National Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985). In this regard, Respondent introduced excerpts from numerous third-party websites in which the word "Job" was incorporated as part of the marks or trade names used in connection with employment and recruitment related services.[74] The following websites are representative:

a. Job Rooster (linkedin.com/companyjob-rooster)[75]

> At Job Rooster, our vision is to connect every worker to the global marketplace of professional opportunity. … Through our service, you can have local job postings, volunteer assignments or educational class listings sent directly to your mobile phone via text message without ever needing a computer or Internet connection. Just text the word JOBS to 27697 (or to 415-787-3906 for MetroPCS) to have customized jobs sent to your phone via text message.

b. Job Fit (Kenexa.com)[76]

> Kenexa Job Fit is a powerful tool designed to identify candidates whose job preferences match the characteristics of a job. Applicable to any job, this easy-to-use solution is ideal as a first step in the selection process. By helping to improve employee engagement, job satisfaction and organizational commitment, Kenexa Job Fit can improve overall employee retention.

---

[74] 85 TTABVUE 297-391.

[75] 85 TTABVUE 309.

[76] 85 TTABVUE 356.

c. JobSync (jobsync.com)[77]

> JobSync
>
> Your ATS. Just Easier
>
> Simplify your current ATS.
>
> JobSync creates an intuitive interface for your existing ATS to make it more user-friendly for your recruiters and hiring managers.

Respondent also introduced copies of news articles about job, employment and recruiting products demonstrating the use of "job-formative" marks.[78] For example, the Capterra (capterra.com) website reviewed "Top Applicant Tracking Software Products" including those of Respondent, Jobscience Staffing, JobApp, JobDig Tracker, Petitioner, JobPage, JobScore, and Jobtrain.[79] It also reviewed "Top Recruiting Software Products" including Respondent's, Petitioner's, as well as those of Jobscience Staffing, JobAdder, Jobaline, JobApp, JobDig Tracker, jobdreaming, JobPage, JobScore, and Jobtrain.[80]

In view of the highly descriptive nature of the word "Job," as evidenced by its extensive use by third parties in connection with personnel and recruiting software applications, we find that consumers will turn to the other portions of the marks and trade names to identify and distinguish the sources of those products and services.

JOBVITE is not visually similar to JOBDIVA.

---

[77] 85 TTABVUE 381.

[78] 85 TTABVUE 417-457.

[79] 85 TTABVUE 431-436.

[80] 85 TTABVUE 338-443.

JOBVITE is not aurally similar to JOBDIVA. Applicant argues, to the contrary, that the suffix syllable VITE in the mark JOBVITE is derived from the French word "vite" meaning "quickly" or "lively" and is, therefore, pronounced "VEET" which is similar to the pronunciation of "Diva" ("DEEVA").[81] However, JOBVITE is a combination of the words "Job" and the term "Vite" which is an abbreviation for "invitation."[82] "[W]hich was the idea of you sending someone a Jobvite, invitation, networking."[83] As Respondent's CEO testified:

> Q.    Going back to the term Jobvite, we discussed where the term job came from or what it means. Do you have an understanding, based on your due diligence and your time at Jobvite, as to how the term "vite" came about?
>
> A.    Yeah. Well, it was immediately apparent to me the first time I heard it what it meant. It meant job invitation. There were other similar brands out there with similar use of the suffix "vite." So it was immediately apparent what it meant, job invitation.
>
> *      *      *
>
> Q.    And so when you say an invitation, so is it your understanding that Jobvite came about as a combination of job and a job invitation for job invite?

---

[81] Petitioner's Brief, p. 11 (91 TTABVUE 17). The word "vite" is an adverb used in music defined as "briskly; lively." Dictionary.com based on the RANDOM HOUSE DICTIONARY (2013). (77 TTABVUE 7). See also *Merriam-Webster* online (merriam-webster.com) ("quickly, lively – used chiefly as a direction in music.") (77 TTABVUE 10).

[82] Schultz deposition, 79 TTABVUE 10.

[83] Schultz deposition, 79 TTABVUE 10 and 15 ("It was a job invitation."); Schultz deposition, 85 TTABVUE 477 ("but everyone can send out a Jobvite which is a job invitation.").

> A.     Yes, that's why Jesper and his team came up with
> the name Jobvite.[84]

The testimony from Respondent's witness is corroborated by Respondent's

advertising. Excerpts from Respondent's advertising is set forth below:

[85]

Jobvite offers a Web-based service customers use to create and broadcast job invitations, or "jobvites," to employees, business associates, candidates or on social networks like Facebook or LinkedIn. The software works with common workplace software like Microsoft Outlook and Word, making it easy to integrate Jobvite functions with programs that in-house recruiters and hiring managers use to set up job interviews or circulate candidate evaluation forms.

[86]

messages, These personalized job invitations, Jobvites, immediately engage recipients – who then can easily share them as well on leading social networks, virally targeting and finding high quality candidates. This is a powerful new addition to Jobvite's leading eRecruitment application,

[87]

Jobvite is different from traditional tools because it goes beyond posting jobs and focuses on building a talent network. It does this through a social recruitment engine that involves every employee in the recruitment process, It sends "jobvites", invitations, to contacts either through email or sharing options (LinkedIn, Facebook, and Twitter) to everyone in their network,

Because a trademark owner cannot control how its mark is pronounced, there is

no one correct pronunciation of a coined mark. In this case, however, we find that it

---

[84] Finnigan deposition, 89 TTABVUE 34-35.

[85] 86 TTABVUE 50.

[86] 86 TTABVUE 64.

[87] TTTABVUE 65 and 78.

is more likely that the "vite" suffix in Respondent's mark JOBVITE will be pronounced as the suffix in the word "invite" because of the commercial impression of a job invitation.

JOBVITE and JOBDIVA have different meanings and engender different commercial impressions. As discussed immediately above, JOBVITE means a job invitation or job invite and it engenders the same commercial impression. JOBDIVA, on the other hand, connotes a successful job and it engenders the commercial impression of being the best personnel and recruitment software.[88]

We find that the marks are not similar in terms of appearance, sound, connotation or commercial impression.

6. Balancing the factors.

Although the services are identical and presumed to move in the same channels of trade and are sold to the same classes of consumers, because the marks are not similar and because the prospective customers will exercise a high degree of care when making their purchasing decisions, we find that Respondent's mark JOBVITE for "providing employment-related services via an online website, namely, providing employment and career information, providing job referral, posting and listing services, and providing business networking services including arranging business introductions" is not likely to cause confusion with Petitioner's mark JOBDIVA and

---

[88] "Diva" is defined as a "prima donna" or "a usually glamorous and successful female performer or personality <a fashion *diva*>; *especially*: a popular female singer <pop *divas*>" *Merriam-Webster* online (merriam-webster.com). Diya Obeid testified that the word "diva" in the mark JOBDIVA has the standard meaning of that word. (82 TTABVUE 48-49). "It was meant to be a pleasant term, an attractive term to be utilized as a reference to the system and the product and the company we were forming." (82 TTABVUE 49).

design for "computer services, namely, providing databases featuring recruitment and employment, employment advertising, career information and resources, resume creation, resume transmittals and communication of responses thereto via a global computer network."

D. Fraud

Petitioner alleges that "Respondent was not using the alleged mark JOBVITE in U.S. commerce with or in connection with all of the services identified in the [3103253] Registration as of the date the '998 Application was filed."[89] In its brief, Petitioner alleges that when Respondent filed it use-based application, "the mark was not in use for 'posting and listing services'; instead the term "Jobvite' was used by Respondent to solely identify a means of sending a job listing."[90]

Fraud in procuring a trademark registration occurs when an applicant knowingly makes false, material representations of fact in connection with its application with intent to deceive the USPTO. *See In re Bose Corp.*, 580 F.3d 1240, 1245, 91 USPQ2d 1938, 1941 (Fed. Cir. 2009); *see also Nationstar Mortg. LLC v. Ahmad,* 112 USPQ2d 1361, 1365 (TTAB 2014); *Swiss Watch Int'l Inc. v. Fed'n of the Swiss Watch Indus.*, 101 USPQ2d 1731, 1745 (TTAB 2012). A party alleging fraud in the procurement of a registration bears the heavy burden of proving fraud with clear and convincing evidence. *Bose*, 91 USPQ2d at 1243 (quoting *Smith Int'l, Inc. v. Olin Corp.*, 209 USPQ 1033, 1044 (TTAB 1981)). For example, the Board will not find fraud if the evidence shows that a false statement was made with a reasonable

---

[89] Paragraph No. 16 of the Petition for Cancellation (1 TTABVUE 6).

[90] 91 TTABVUE 21.

and honest belief that it was true, rather than intent to mislead the USPTO into

issuing a registration to which the applicant was not otherwise entitled. *See id.*; *see*

*also Woodstock's Enters. Inc. (Cal.) v. Woodstock's Enters. Inc. (Or.)*, 43 USPQ2d

1440, 1443 (TTAB 1997), *aff'd,* Appeal No. 97-1580 (Fed. Cir. Mar. 5, 1998).

Deceptive intent is an essential element to a fraud claim.

> Subjective intent to deceive, however difficult it may be to
> prove, is an indispensable element in the analysis. Of
> course, "because direct evidence of deceptive intent is
> rarely available, such intent can be inferred from indirect
> and circumstantial evidence. But such evidence must still
> be clear and convincing, and inferences drawn from lesser
> evidence cannot satisfy the deceptive intent requirement."
> *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d
> 1357, 1366 [88 USPQ2d 1001] (Fed. Cir. 2008). When
> drawing an inference of intent, "the involved conduct,
> viewed in light of all the evidence … must indicate
> sufficient culpability to require a finding of intent to
> deceive." *Kingsdown [Med. Consultants, Ltd. v. Hollister
> Inc.]*, 863 F.2d 867, 876 [9 USPQ2d 1384] (Fed. Cir. 1988).

*Bose*, 91 USPQ2d at 1941.

Petitioner's fraud claim fails because Petitioner did not prove by "clear and

convincing" evidence that Respondent intended to deceive the USPTO.[91] Petitioner

relies on the testimony of Jesper Schultz regarding Respondent's posting and listing

services, which may be charitably characterized as muddled.[92] At the outset, we

---

[91] Respondent's statements regarding its use of JOBVITE for the identified services as of
the application's filing date certainly were material to the examining attorney's approval of
the application for publication. Averments and evidence of use of a mark for the goods or
services identified in a use-based application are critical to the approval of a use-based
application, and if it had been disclosed to the examining attorney that the mark was not in
use for the identified services, registration would have been refused. *See Nationstar Mortg.
LLC v. Ahmad,* 112 USPQ2d at 1365.

[92] This is not a criticism of the witness. Mr. Schultz did his best to answer the questions
Petitioner posed during his discovery deposition. The difficulty of proving a fraud claim,

note that rather than proffer testimony or evidence defining "posting and listing" services, Petitioner decided to rely on the Board's inherent omniscience. The Court of Appeals for the Federal Circuit, our primary reviewing court, frowns on our exercise of that power. *See Amalgamated Bank of New York v. Amalgamated Trust & Savings Bank,* 842 F. 2d 1270, 6 USPQ2d 1305, 1308 (Fed. Cir. 1988) ("It would be strange for the customers of the banks to be confused about whom they were dealing with, and their bankers not know it. On the other hand, the board lays claim to an arsenal of superior knowledge about the banking business, or else it would not perceive, as it seems to do, that the bankers are not telling it the truth, or that deregulation effects such changes that the teaching of experience must be ignored. The source of the board's knowledge is hard to divine. It is certainly not in the record, which is wholly devoid of anything to discredit or contradict the recitals in the agreement. … The TTAB's reliance on its own views regarding the banking industry, rather than the views of the parties in question, contravenes the scope and intent of this court's precedent in *DuPont* and *Bongrain*.").

It is not clear from the record whether "posting and listing" is a term of art with a specific meaning in the recruiting field. Also, it is not clear whether the activities of posting and listing positions are integral to or distinct from each other[93] (*i.e.,* you

---

including the challenge of proving deceptive intent, is no secret, each element of the claim must be proved by "clear and convincing" evidence.

[93] In identifying goods or services in an application, there is no general prohibition against using terms which overlap in scope or are inclusive of another term. *See Tri-Star Marketing LLC v. Nino Franco Spumanti S.R.L.*, 84 USPQ2d 1912 (TTAB 2007) (applicant who identified its goods as "wines and sparkling wines" did not commit fraud notwithstanding use of its mark only on sparkling wines).

do not have one without the other). For example, what is the point of posting jobs if there is no means to list or publish them? In the alternative, does a party that lists jobs post them as well? What we can glean from Mr. Schultz's testimony is that Respondent rendered posting and listing services through Forumjobs on the forumjobs.com website which were the same services as those identified in Respondent's JOBVITE application.

> Q.    In December, 2005 … was the name of the company still forumjobs?

> A.    That is correct.

> Q.    And was the name of the flagship service forumjobs?

> \*        \*        \*

> A.    I think it's one in [sic] the same. I mean, Jobvite and forumjobs, that's kind of the service we have, yeah. And we called the - - the URL was, you know, forumjobs.

> Q.    So - -

> A.    That was the service we - - I mean, the - - that we sold.

> Q.    Forumjobs was the service - - was the same service that you sold as Jobvite?

> A.    Yeah. I mean, that was the whole idea here.[94]

> \*        \*        \*

> Q.    . . . So the question is, were Jobvite and forumjobs the same service?

> \*        \*        \*

---

[94] Schultz deposition, 85 TTABVUE 484.

A.    Yes.[95]

\*        \*        \*

Q.    Why would you have two different names for the identical service?

A.    Why? We started out with Jobvite - - with forumjobs, and then it kind of became clear that - - it was - - it became - - when we started using Jobvite, it kind of became clear that it was the same - - it was the same thing we were doing, and that's why we, you know, like changed the name in 2000, I think it was '[200]6.

Q.    Okay. What about in December 2005?

A.    It was the same service.[96]

Even assuming that when Respondent filed the application for registration, Respondent used the service mark FORUMJOBS to post jobs and the service mark JOBVITE to list jobs, Respondent did not intend to deceive the USPTO because Respondent thought that JOBVITE and FORUMJOBS were one and the same. If so, Respondent was wrong and made a mistake. But there is no evidence that Respondent was deceitful.

Petitioner argues that we should infer from the surrounding facts and circumstances that Respondent knowingly made a false representation with the intent to deceive the USPTO, citing *Nationstar Mortg. LLC v. Ahmad, supra*.[97] However, the conduct of the Applicant in *Nationstar* was far more egregious than anything encountered in this case. For example, in *Nationstar,* the Board expressed

---

[95] Schultz deposition, 85 TTABVUE 485.

[96] Schultz deposition, 85 TTABVUE 486.

[97] Petitioner's Reply Brief, p. 8 (98 TTABVUE 12).

grave concerns about the credibility of applicant's testimony — particularly his evasiveness and failure to respond directly to straightforward questions. *Id.* at 1370. Mr. Schultz, testifying on behalf of Respondent, was cooperative and appeared to do his best to answer counsel's questions.

Further, although the *Nationstar* applicant "repeatedly testified that specific information could be found in the documents he produced, he did not introduce or identify any documents corroborating his testimony." *Id.* at 1372. Moreover, the documents on which the *Nationstar* applicant relied could not be considered corroborative, because the applicant's testimony was so lacking in conviction and credibility as to be virtually incapable of corroboration. *Id.* There was no such evasiveness on the part of Respondent's witness in this case.

Finally, the Board noted that the *Nationstar* applicant, as a real estate agent, was well aware of the restrictions on his activities as a real estate agent and that separate licensure is required to engage in other real-estate-related services such as real estate brokerage, insurance brokerage, and mortgage brokerage for which he sought registration when in fact he was not rendering those services. *Id.* at 1373. There is no reason to question Mr. Schultz's credibility in this case.

The fraud claim is dismissed.

**Decision**: The counterclaim to cancel Registration No. 2851917 on the ground that Petitioner abandoned the mark is granted.

The counterclaim to partially cancel Registration No. 3013235 on the ground that Petitioner abandoned the mark when used in connection with "personnel

placement and recruitment" services is granted. Registration No. 3013235 will be restricted in due course.

The petition to cancel Registration No. 3103253 on the grounds of likelihood of confusion and fraud is denied.

> This Opinion is Not a
> Precedent of the TTAB

Mailed: May 20, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*JobDiva, Inc.*
*v.*
*Jobvite, Inc.*

_____

Cancellation No. 92050828

_____

REQUEST FOR RECONSIDERATION

_____

Daniel I. Schloss of Greenberg Taurig, LLP for JobDiva, Inc.

Martin R. Greenstein of Techmark a Law Corporation for Jobvite, Inc.

_____

Before Taylor, Mermelstein and Bergsman,
    Administrative Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:

This case comes before us on Petitioner's Request for Reconsideration of the Board's April 16, 2015 Order granting Respondent's counterclaim cancelling Petitioner's Registration No. 2851917 for the mark JOBDIVA (typed drawing) for "personnel placement and recruitment," in Class 35[1] and partially cancelling Registration No. 3013235 for the mark JOBDIVA and design, shown below for

_____

[1] Issued June 8, 2004; renewed.

"personnel placement and recruitment services; computer services, namely, providing databases featuring recruitment and employment, employment advertising, career information and resources, resume creation, resume transmittals and communication of responses thereto via a global computer network," in Class 35.[2]



The Board found, on the counterclaim for cancellation, that Petitioner abandoned its use of the JOBDIVA marks in connection with "personnel placement and recruitment" because Petitioner submitted no evidence to rebut Respondent's showing that Petitioner has not used its mark in connection with the services, or that Petitioner does not intend to resume such use, and there was nonuse for three consecutive years, constituting *prima facie* evidence of abandonment.

Petitioner argues that the Board made erroneous findings of fact because there is "abundant evidence of record" that shows Petitioner providing the service of "finding and placing people in jobs at other companies or providing personnel staffing services for others."[3] Petitioner renders these services on a software-as-a-service or "SaaS" basis to third parties.[4] Thus, Petitioner asserts that it renders "personnel placement and recruitment" services.

---

[2] Issued November 8, 2005; Section 8 affidavit accepted.

[3] 103 TTABVUE 3.

[4] 103 TTABVUE 4.

> The fact that JobDiva's personnel placement and recruitment services are rendered on a SaaS basis using technology and automated methods does not detract in any way from the essential nature of its services.[5]

Software as a Service (SaaS) leverages software by delivering it over the Internet.[6]

> Software as a Service (SaaS) enables businesses to shift their computing applications to the Internet. In the purest sense of the phrase, SaaS shifts the burden of housing and hosting data, and enables users to log in to their application from anywhere, at any time.[7]

SaaS is also known as cloud computing.[8] Cloud computing is defined as "computing operations carried out on servers that are accessed through the Internet, rather than on one's own personal computers. …The users pay for the computing as a service rather than owning the machines and software to do it."[9] "This enables customers to be able to focus on their core business objectives, and frees them from dedicating resources to support the enterprise application on an ongoing basis."[10]

The issue of whether Petitioner is rendering "personnel placement and recruitment" depends on how Petitioner uses its mark. A term that *only* identifies a

---

[5] *Id.*

[6] **ENCYCLOPEDIA OF EMERGING INDUSTRIES**, p. 828 (2011). The Board may take judicial notice of information from encyclopedias. *Productos Lacteos Tocumbo S.A. de C.V. v. Paleteria La Michoacana Inc.*, 98 USPQ2d 1921, 1934 n.61 (TTAB 2011); *B.V.D. Licensing Corp. v. Body Action Design Inc.*, 846 F.2d 727, 6 USPQ2d 1719 (Fed. Cir. 1988).

[7] *Id.*

[8] **DICTIONARY OF COMPUTER AND INTERNET TERMS**, p. 434 (11th ed. 2013). The Board may take judicial notice of dictionary definitions. *University of Notre Dame du Lac v. J. C. Gourmet Food Imports Co.*, 213 USPQ 594, 596 (TTAB 1982), *aff'd*, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983).

[9] *Id.*

[10] **ENCYCLOPEDIA OF EMERGING INDUSTRIES**, p. 828.

- 3 -

computer program does not become a service mark merely because the program is sold or licensed in commerce. Such a mark does not serve to identify a service unless it is also used to identify and distinguish the service itself, as opposed to the program. *In re DSM Pharmaceuticals, Inc.*, 87 USPQ2d 1623 (TTAB 2008) (term that merely identifies computer software used in rendering services does not function as a mark to identify custom manufacturing of pharmaceuticals); *In re Information Builders Inc.*, 213 USPQ 593 (TTAB 1982) (term identifies only a computer program, not the service of installing and providing access to a computer program); *In re Walker Research, Inc.*, 228 USPQ 691 (TTAB 1986) (term that merely identifies computer program used in rendering services does not function as a mark to identify market analysis services). However, it is important to review the record carefully to determine the manner of use of the mark and the impression it is likely to make on purchasers.

> [I]n today's commercial context if a customer goes to a company's website and accesses the company's software to conduct some type of business, the company may be rendering a service, even though the service utilizes software. Because of the ... blurring between services and products that has occurred with the development and growth of web-based products and services, it is important to review all the information in the record to understand both how the mark is used and how it will be perceived by potential customers.

*In re Ancor Holdings*, 79 USPQ2d 1218, 1221 (TTAB 2006) (INFOMINDER found to identify reminder and scheduling services provided via the Internet, and not just software used in rendering the services).

In accordance with the directive in *Ancor Holdings*, we reviewed (and now review again) the evidence regarding Petitioner's use of JOBDIVA as a service mark for "personnel placement and recruitment," paying particular attention to the evidence referenced by Petitioner in the Request for Reconsideration. We looked for evidence that Petitioner was rendering "personnel placement and recruitment services" for others rather than merely providing a software solution for clients to use in performing their "personnel placement and recruitment" activities.

Petitioner confuses the service of providing a software solution for personnel placement and recruitment with actually rendering personnel placement and recruitment services. There is simply no testimony or evidence that supports Petitioner's claim that it is rendering "personnel placement and recruitment" as an activity other than by providing "personnel placement and recruitment" software. The references on Petitioner's web sites show that Petitioner is supplying "personnel placement and recruitment" software, not that Petitioner itself is rendering "personnel placement and recruitment" services for others. Also, the testimony referenced by Petitioner in its Request for Reconsideration is taken out of context and does not support Petitioner's claim that it is rendering "personnel placement and recruitment" services for others separate and apart from providing its software. The references discussed below are illustrative.[11]

---

[11] While we have not referenced every citation to the record by Petitioner in this decision, we have reviewed the evidence and we find that there is no evidence that shows Petitioner rendering "personal placement and recruitment."

With respect to Obeid testimony Exhibit No. 2, an excerpt from Petitioner's website used by Petitioner for demonstrations,[12] Diya Obeid, Petitioner's Chief Executive Officer, testified as follows regarding the functionality of the **JobDiva** system:

> JobDiva aggregates resumes for its clients, employers, from the job boards . . . they apply to job boards to source candidates and that is usually a manual exercise," but JobDiva can "search the job board's sites and databases for candidates on behalf of employers who are subscribing to these job boards, so it's almost like an outsource function that JobDiva performs in the recruiting process.[13]

However, Exhibit 2 does not provide any evidence that Petitioner renders "personnel placement and recruitment services" other than by providing the software that performs those functions. As noted above, Mr. Obeid during his testimony deposition was discussing the capabilities of Petitioner's *software* not the rendering of "personnel placement and recruitment" services by Petitioner.

Petitioner also references another version of its website introduced through a notice of reliance.[14] In the section regarding "New Job Requisitions," Petitioner's website states that "JobDiva offers a data-rich Job screen that's easy to set up and loaded with unique features designed to minimize administrative work and maximize recruiters' time."[15] From the webpage "Benefit from Ongoing Electronic Sourcing of Candidates" Petitioner, in the Request for Reconsideration, references

---

[12] 82 TTABVUE 22.

[13] 82 TTABVUE 25.

[14] 90 TTABVUE.

[15] 90 TTABVUE 31.

the following quote: "[JobDiva's] harvesters are constantly sourcing from job boards. They'll be searching based on your specific criteria of all jobs."[16] The full text of the webpage is shown below:

## 9. Benefit from Ongoing Electronic Sourcing of Candidates

When you first open a job and launch a search in JobDiva, you aren't searching from scratch.

JobDiva's harvesters have built your company an extensive database of potential candidates who matched prior jobs.

The harvesters are constantly sourcing from job boards. They'll be searching based on your specific criteria of all jobs.

They'll also be searching based on 'evergreen criteria' – criteria not associated with an open job but instead skills that recruiting managers have set as always relevant to your staffing needs.

Petitioner's "harvesters" are functions or capabilities of the **JobDiva** software, not activities performed by Petitioner for the purpose of offering "personnel placement and recruitment services" for others. In the webpages about "Job Harvesting," Petitioner explains that its "harvesters run silently in the background to create a rich database of candidates for your company to draw on."[17]

> More than any other Applicant Tracking System, JobDiva automates hunting, sourcing, data maintenance and other tedious aspects of the recruiting workflow, so that your recruiters won't even notice there is a workflow.
>
> They can now focus exclusively on the industry's most important activity: speaking to the most suitable candidates, whom JobDiva's searches produce quickly and

---

[16] 90 TTABVUE 58.

[17] 90 TTABVUE 80.

> in abundance, so that they can beat the competition again and again.[18]
>
> \*        \*        \*
>
> JobDiva's harvesters scrape resumes which meet that set criteria.
>
> JobDiva then parses the resumes and automatically sets up searchable electronic candidate files.[19]

The full text of the website makes clear that Petitioner is referring to the capabilities of its software system used in the field of "personnel placement and recruitment services."

As noted above, there is no testimony or evidence that supports Petitioner's claim that it is rendering "personnel placement and recruitment" as an independent activity distinct from providing its software to others.

**Decision**: The request for reconsideration is denied.

---

[18] 90 TTABVUE 82.

[19] 90 TTABVUE 84.

FORM 30. Certificate of Service

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on   November 2, 2015
by:

☒ U.S. Mail

☐ Fax

☐ Hand

☒ Electronic Means (by E-mail or CM/ECF)

| Daniel I. Schloss | /s/ Daniel I. Schloss |
|---|---|
| Name of Counsel | Signature of Counsel |

| | |
|---|---|
| Law Firm | Greenberg Traurig, LLP |
| Address | 200 Park Avenue, 38th Floor |
| City, State, Zip | New York, NY 10166 |
| Telephone Number | 212-801-2256 |
| Fax Number | 212-805-5571 |
| E-Mail Address | schlossd@gtlaw.com |

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

Reset Fields

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    this brief contains 2,068 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14 point Times New Roman font.

Dated:  November 2, 2015

By:  */s/* Daniel I. Schloss
Daniel I. Schloss
GREENBERG TRAURIG, LLP
200 Park Avenue
New York, New York 10166
Tel: (212) 801-2256
*Attorneys for Appellant*